UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERIE A. PALMER,<br><br>   Plaintiff,<br><br> v.<br><br>ANDREW M. SAUL[1],<br>Commissioner of Social Security,<br><br>   Defendant. | Case No.: 1:18-cv-0356 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(G)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF CHERIE A. PALMER AND AGAINST DEFENDANT ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY |

Cherie Palmer asserts she is entitled to benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the medical record. Because the ALJ failed to apply the proper legal standards evaluating Plaintiff's impairments at step two and ignored significant, probative evidence in the record, the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **BACKGROUND**

On July 19, 2012, Plaintiff filed an application a period of disability and disability insurance benefits. (Doc. 9-8 at 2) The Social Security Administration denied her applications at the initial level and upon reconsideration. (Doc. 9-6 at 4-8) Plaintiff requested a hearing and testified before an ALJ on March 10, 2014. (*See* Doc. 9-3 at 39) The ALJ determined Plaintiff was not disabled and issued an

---

[1] This action was originally brought against Nancy A. Berryhill in her capacity as then-Acting Commissioner. Andrew M. Saul, the newly appointed Commissioner, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

1

order denying benefits on April 21, 2014. (Doc. 9-5 at 30)

Plaintiff requested review by the Appeals Council, which granted the request and remanded the case to an ALJ. (Doc. 9-5 at 55) The Appeals Council determined, "The medical evidence identifie[d] mental impairments, but the hearing decision [did] not contain an evaluation of these impairments." (*Id.*) In addition, the Appeals Council found the ALJ failed to determine whether the testimony from a vocational expert was consistent with the *Dictionary of Occupational Titles*, and there was "no discussion with specific references to the record regarding the claimant's [residual functional capacity] and her past work as a receptionist." (*Id.* at 56) The Appeals Council directed the ALJ to evaluate Plaintiff's mental impairments, obtain evidence from a medical expert regarding her impairments, further consider Plaintiff's residual functional capacity, and obtain supplemental evidence from a vocational expert. (*Id.*)

Plaintiff testified at a second administrative hearing on December 1, 2016. (*See generally* Doc. 9-4) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on March 28, 2017. (Doc. 9-3 at 18-29) Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on January 4, 2018. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that

detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence[2]**

Dr. Gary Gaffield performed a consultative examination on August 10, 2012. (Doc. 9-11 at 25) Plaintiff told Dr. Gaffield that she had right shoulder pain, which she attributed to a skiing injury in

---

[2] The Court has reviewed the entire medical record related to Plaintiff's physical and mental impairments. However, this summary focuses upon Plaintiff's shoulder impairments due to the issue presented in the opening brief.

3

1996. (Doc. 9-11 at 25) Dr. Gaffield determined Plaintiff had "[w]eakness [in] the right shoulder... with full range of motion." (*Id.* at 27) Plaintiff's deep tendon reflexes were 2/4 in her biceps. (*Id.* at 28) He found Plaintiff's range of motion was "[w]ithin normal limits" for both shoulder joints, and her strength was "5/5" in all extremities, with the exception of the right shoulder, which was "4/5." (*Id.*) Dr. Gaffield concluded Plaintiff was able to stand and walk for six hours in an eight-hour day and sit without restriction. (*Id.* at 29) In addition, Dr. Gaffield opined Plaintiff was limited to "lifting and carrying ... not more than 20 pounds occasionally and 10 pounds frequently due to the weakness of her right shoulder." (*Id.*) He believed Plaintiff could perform all postural activities on an occasional basis, "limited by her obesity and her right knee." (*Id.*)

Dr. Elke Mese reviewed Plaintiff's records at the initial level of her application and noted "[t]here were no records to refute" the opinion offered by Dr. Gaffield. (Doc. 9-5 at 9) Dr. Mese opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. (*Id.*) According to Dr. Mese, Plaintiff had an unlimited ability to climb ramps and stairs, balance, stoop, and crouch. (*Id.* at 9-10) Dr. Mese also opined Plaintiff could occasionally crawl; kneel; and climb ladders, ropes, and scaffolds. (*Id.*) Finally, Dr. Mese opined Plaintiff should "[a]void concentrated exposure" to hazards such as machinery and heights. (*Id.* at 10) Dr. Mese indicated these limitations considered Plaintiff's "impairments and ... pain and... sustainability." (*Id.*)

On February 4, 2013, Dr. Howard Platter opined Dr. Gaffield's opinion was "mostly consistent [with] the exam [and] totality of the evidence," but found "no evidence to support the postural [and] environmental limitations given." (Doc. 9-5 at 23) Dr. Platter adopted the findings that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, sit for six hours in an eight-hour day, and stand and/or walk for six hours in an eight-hour day. (*Id.* at 23-24) He opined Plaintiff had an unlimited ability to balance and climb ramps and stairs; could occasionally climb ladders, ropes, and scaffolds; and frequently stoop, bend, and kneel. (*Id.* at 24) Further, Dr. Platter indicated Plaintiff did not have any environmental limitations and could have an unlimited exposure to hazards. (*Id.* at 24-25)

In November 2013, Plaintiff visited Dr. Leyen Vu upon the referral of Margene Fields, RN. (Doc. 9-12 at 18) Dr. Vu noted Plaintiff had a history of "bilateral shoulder pain for the five to ten

years," and Plaintiff said her "right [was] worse than the left." (*Id.*) Dr. Vu determined Plaintiff's range of motion in her right shoulder was 140 degrees with abduction, 160 degrees with flexion, and 60 degrees with external rotation; and in the left shoulder, Plaintiff could move 180 degrees with abduction and forward flexion, and 60 degrees with external rotation. (*Id.* at 19) Her strength was "5/5 in all radial rotator cuff muscles." (*Id.*) Dr. Vu reviewed x-rays of Plaintiff's shoulders and found a "fairly flat acromion" in the right shoulder and "somewhat of a narrow acromiohumeral space" and "a fairly flat acromion" in the left shoulder." (*Id.* at 20) Dr. Vu diagnosed Plaintiff with "[b]ilateral biceps tendinitis, right greater than the left," and believed Plaintiff "also [had] features of rotator cuff pathology." (*Id.*) Dr. Vu administered corticosteroid injections in Plaintiff's right arm and referred her to physical therapy. (*Id.*)

In January 2014, Plaintiff told Dr. Vu that she had "minimal relief" from the physical therapy. (Doc. 9-12 at 21) However, Plaintiff said she was "doing very well" following the injections. (*Id.*) Upon examination, Dr. Vu found Plaintiff had a normal range of motion in her right shoulder and her rotator cuff strength was 5/5. (*Id.*) He determined Plaintiff's range of motion in the left shoulder was limited to 170 degrees with abduction and 160 degrees with forward flexion. (*Id.*) Dr. Vu administered injections to Plaintiff's left shoulder. (*Id.* at 22, 23) At a follow-up two weeks later, Plaintiff reported she was "doing very well," but her left shoulder "still hurt[] with movement." (*Id.* at 23) Dr. Vu noted Plaintiff had a positive Hawkins test and Speeds test and opined Plaintiff's left shoulder pain "could be coming from her rotator cuff versus AC joint." (*Id.* at 24) Dr. Vu administered a left subacromial injection, and indicated if Plaintiff's pain did not improve, he would like an MRI of the shoulder. (*Id.*)

Plaintiff reported she felt "a lot better" in February 2014, and the "subacromial injection … gave her 60% relief." (Doc. 9-12 at 26) She also told Dr. Vu that she had "a popping sensation in her shoulder," though she was not sure what caused it. (*Id.*) Dr. Vu found Plaintiff had an "essentially … normal range of motion in her shoulders," with "mild tenderness along her biceps tendon" in the left shoulder. (*Id.*) Dr. Vu opined Plaintiff's left shoulder impairment was a "left rotator cuff tendinitis/ partial tear." (*Id.*)

In March 2014, Cheryl Woods evaluated Plaintiff for physical therapy, and noted Plaintiff described "multiple areas of pain," including her shoulders, neck, knees, low back, and ankles. (Doc.

9-13 at 41) Ms. Woods determined Plaintiff's strength in her rotator cuff muscles was "4/5 with some pain." (*Id.*) Plaintiff demonstrated a limited range of motion with the left arm and tenderness. (*Id.* at 42-43) Ms. Woods opined Plaintiff would benefit from physical therapy "to decrease irritation of her joints and muscles and improve strength and functional activity tolerance," and Plaintiff's treatment plan involved two sessions of physical therapy per week for three months. (*Id.* at 44)

On March 28, 2014, Dr. Vu examined Plaintiff and found she had a "normal range of motion passively," while actively, she could "only get up to about 140 degrees of abduction." (Doc. 9-13 at 47) In addition, Plaintiff had a positive Hawkins test. (*Id.*) Dr. Vu opined Plaintiff's "[r]otator cuff strength [was] 5/5." (*Id.*) Dr. Vu indicated he gave Plaintiff "home exercises for her bilateral shoulders." (*Id.*)

Plaintiff continued to report shoulder pain on April 14, 2014 at which she was examined by Nurse Practitioner, Margene Fields. (Doc. 9-14 at 73) Nurse Fields determined Plaintiff had a "decreased [range of motion]" with her left shoulder, and she exhibited pain with palpation and range of motion. (*Id.* at 76) The following week, Plaintiff discontinued her physical therapy sessions, reporting her left shoulder and arm pain was "getting worse." (*Id.* at 4-5)

In October 2014, Ms. Fields noted Plaintiff's overall condition was "worsening," with pain in her hands, lumbar spine, and neck. (Doc. 9-15 at 26) The following month, Ms. Fields again referred Plaintiff to Dr. Vu for treatment of Plaintiff's shoulder, neck, knees, and hips. (*Id.* at 28, 31)

On December 8, 2014, Ms. Fields found that Plaintiff continued to have a "decreased range of motion of her left shoulder." (Doc. 9-15 at 6) She also noted Plaintiff had "received injections in the shoulder joint." (*Id.*) Ms. Fields opined that Plaintiff had "a marked significance" with joint pain "that would interfere with the ability to perform 1 or more basic work related activities." (*Id.*) She believed Plaintiff "could possibly do a part-time, desk job, 2-4 hours a day." (*Id.*)

Later in December 2014, Dr. Vu found Plaintiff had a "normal range of motion" in her left shoulder, though she exhibited "point tenderness along her subacromial area and also her anterior shoulder around her biceps tendon." (Doc. 9-16 at 27) He opined Plaintiff's "rotator cuff strength [was] 5/5 in all planes of motion; however, she [had] pain with [the] empty can test." (*Id.*) In addition, Plaintiff again had a positive Hawkins test. (*Id.*) Dr. Vu opined Plaintiff's pain was "more persistent

with rotator cuff," and repeated a subacromial injection into Plaintiff's left shoulder. (*Id.*) He administered a third injection in February 2015. (*Id.* at 14-15)

In March 2015, Plaintiff told Dr. Vu that there was "no change" in her shoulder, and Dr. Vu determined she had pain "with terminal external rotation." (Doc. 9-16 at 12) Dr. Vu also found Plaintiff had a normal range of motion in her left shoulder, and her "[r]otator cuff strength [was] 5 out of 5." (*Id.*) At that time, Dr. Vu opined the etiology of Plaintiff's left shoulder pain was unclear and ordered an MRI of her shoulder. (*Id.*)

On March 27, 2015, Plaintiff underwent an MRI on her left shoulder. (Doc. 9-16 at 38-39) Dr. Jack Fields determined Plaintiff had a "[r]etracted full-thickness tear of the supraspinatus ventrally on a background of tendinosis," "mild tendinosis and attenuation of the infraspinatus and subscapularis" and arthropathy with "localized fluid within the subcoracoid bursa tracking into the upper arm deep into the short head of the biceps muscle." (*Id.* at 39)

On March 31, 2015, Dr. Vu explained the MRI showed a "complete rupture" of the left rotator cuff. (Doc. 9-16 at 7) He found Plaintiff's range of motion in her left shoulder was limited to 103 degrees with abduction actively and 140 degrees passively. (*Id.*) Dr. Vu noted the injections provided only "temporary relief," and he believed surgical intervention was needed. (*Id.*)

Dr. William Peterson performed an orthopedic evaluation regarding Plaintiff's left shoulder and left hip on April 13, 2015. (Doc. 9-15 at 64-68) Plaintiff told Dr. Peterson that her pain was constant, but also increased with activity, and "overhead and behind the back activity [was] the worst." (*Id.* at 67) According to Dr. Peterson, Plaintiff's range of motion was limited to 90 degrees with abduction and forward elevation was 120 degrees, though Plaintiff reported moderate pain at 90 degrees. (*Id.*) He found Plaintiff's "[p]assive range of motion [was] slightly better than active motion." (*Id.*) Dr. Peterson also noted Plaintiff had "[m]oderate dysrhythmia with overhead movements." (*Id.* at 68) Further, he found Plaintiff had reduced abduction, sprasinatus, and external rotation strength, at "4/5 with moderate pain." (*Id.*) Dr. Peterson opined "it would be best to proceed with rotator cuff repair," and indicated he would "assess the biceps tendon" at the time of her surgery. (*Id.*)

**B.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff "ha[d] not engaged in substantial

7

gainful activity since August 18, 2012, the alleged onset date." (Doc. 9-3 at 21) Second, the ALJ found Plaintiff's severe impairments included "degenerative disc disease of the lumbar and cervical spine; osteoarthritis of the left hip; obesity; generalized anxiety disorder (GAD); personality disorder; methadone dependence (in remission); alcohol dependence (in remission) [and] cannabis abuse." (*Id.*) The ALJ noted Plaintiff "alleged dysfunction of the shoulders," but found the impairment was non-severe. (*Id.* at 22)

At step three, the ALJ found these impairments did not meet or medically equal a listed impairment. (Doc. 9-3 at 22) Next, the ALJ determined:

> [T]he claimant has the RFC to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), except she can occasionally climb ladders, ropes and scaffolds, can frequently stoop and kneel and occasionally crawl; she must avoid concentrated exposure to vibrations and vibrating equipment; she must avoid tasks involving a variety of instructions or tasks, but is able to understand to carry out simple one- or two-step instructions, and is able to understand to carry out "detailed but uninvolved" written or oral instructions involving a few concrete variables in or from standardized situations; she can occasionally reach overhead; she cannot stand and walk in increments longer than 15-20 minutes, and for no more than 2 hours total in an 8-hour workday.

(*Id.* at 24) Considering this residual functional capacity ("RFC"), and Plaintiff's "age, education, [and] work experience," the ALJ determined there were "jobs that exist in significant numbers in the national economy that she [could] perform." (*Id.* at 27) Thus, the ALJ concluded Plaintiff was "not under a disability, as defined in the Social Security Act, from August 18, 2012, through the date of [the] decision." (*Id.* at 28)

## DISCUSSION AND ANALYSIS

Plaintiff argues that "[t]he ALJ erred by prematurely terminating the disability analysis concerning Plaintiff's left shoulder impairment at step two." (Doc. 17 at 39, emphasis omitted) The Commissioner argues, "the ALJ properly found Plaintiff's alleged left shoulder impairment was not severe under the regulations," and "any error was harmless because the ALJ assessed overhead reaching limitations in Plaintiff's [residual functional capacity]." (Doc. 18 at 23)

**A.     Step Two of the Sequential Evaluation**

The inquiry at step two is a de minimis screening for severe impairments "to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*,

482 U.S. 137, 153-54 (1987)). The purpose is to identify claimants whose medical impairment makes it unlikely they would be disabled even if age, education, and experience are considered. *Bowen*, 482 U.S. at 153 (1987). At step two, a claimant must make a "threshold showing" that (1) she has a medically determinable impairment or combination of impairments and (2) the impairment or combination of impairments is severe. *Id.* at 146-47; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, the burden of proof is on the claimant to establish a medically determinable severe impairment. *Id.*; *see also Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant at steps one through four...").

An impairment, or combination thereof, is "not severe" if the evidence establishes that it has "no more than a minimal effect on an individual's ability to do work." *Smolen*, 80 F.3d at 1290. The Ninth Circuit explained: "The mere existence of an impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). A medical diagnosis alone "does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities." *Nottoli v. Astrue*, 2011 WL 675290, at *3 (E.D. Cal. Feb. 16, 2011). For an impairment to be "severe," it must limit the claimant's ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1522, 416.922. Specifically, basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. §§ 404.1522(b), 416.922(b).

1. The ALJ's findings

At step two, the ALJ found "[w]ith regard to alleged dysfunction of the shoulders…, these are non-severe." (Doc. 9-3 at 22) In support of this determination, the ALJ stated:

> At a 2012 consultative examination, the clamant told Gary Gaffield, D.O. (Dr. Gaffield) that she injured the joints in a 1996 skiing accident, yet was not evaluated at the time. Dr. Gaffield only found slight weakness in the right knee and shoulder, but the remainder of the joint examination was normal (Exhibit 4F). The claimant received bilateral injection therapy for shoulder pain at OOA in 2014, yet this was for "presumed tendinitis" cited by Dr. Vu after negative films of the shoulders (Exhibits 13F/18-20).

(*Id.*) Plaintiff contends the ALJ erred in this analysis by failing "to address evidence in the record" related to Plaintiff's left shoulder impairment and "provided no explanation as to why such probative evidence was not considered in the severity determination." (Doc. 17 at 40)

9

1    As Plaintiff argues, the ALJ did not acknowledge the diagnosis of a left rotator cuff tear, which
2    was confirmed by an MRI in 2015 and evaluated by Dr. Peterson.  In addition, as Plaintiff observes, the
3    ALJ did not address the many findings in the record related to Plaintiff's range of motion with her
4    shoulder.  For example, in January 2014, Dr. Vu determined Plaintiff's range of motion in the left
5    shoulder was limited to 170 degrees with abduction and 160 degrees with forward flexion. (Doc. 9-12
6    at 21)  Likewise, Plaintiff's physical therapist, Cheryl Woods, found Plaintiff had a limited range of
7    motion with the left arm.  (Doc. 9-3 at 41)  By April 2015, Dr. Peterson determined Plaintiff's range of
8    motion was limited to 90 degrees with abduction and forward elevation was 120 degrees and she had
9    "moderate dysrhythmia with overhead movements."  (Doc. 9-15 at 67-68)  Likewise, the ALJ did not
10   acknowledge the positive clinical findings related to diminished strength with Plaintiff's left shoulder/
11   rotator cuff, or the positive Hawkins tests and Speeds tests.  (*See* Doc. 9-3 at 22; *see also* Doc. 9-12 at
12   24; Doc. 9-13 at 41) Finally, the ALJ failed to acknowledge Plaintiff's MRI showing Plaintiff had a
13   "complete rupture" of the left rotator cuff and that surgery was recommended.  (*See* Doc. 9-16 at 7, 38-
14   39)

15   Significantly, in evaluating Plaintiff's *right* shoulder Dr. Gaffield determined Plaintiff had a
16   normal range of motion, but diminished strength.  (Doc. 9-11 at 25)  Dr. Gaffield concluded that
17   Plaintiff was limited to "lifting and carrying ... not more than 20 pounds occasionally and 10 pounds
18   frequently *due to the weakness of her right shoulder*."  (*Id.* at 29, emphasis added)  Thus, Dr. Gaffield
19   opined Plaintiff's shoulder impairment resulted in a limitation of her ability to do basic work activities.
20   *See* 20 C.F.R. §§ 404.1522(b), 416.922(b).  Because Plaintiff's *left* shoulder impairment resulted in
21   positive findings that included both limited range of motion and weakness—and was thus worse than
22   her right shoulder—the ALJ erred by finding her shoulder impairment was not severe.

23       2.    Whether the ALJ's errors were harmless

24   The Commissioner argues that any error by the ALJ in evaluating her impairments at step two
25   "was harmless because the ALJ assessed overhead reaching limitations in Plaintiff's RFC."  (Doc. 18 at
26   17, citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)).  The Commissioner maintains that the
27   limitation to occasional overhead reaching "accommodated Plaintiff's left should symptoms even
28   though the ALJ found the impairment was not severe."  (Doc. 18 at 17)

10

An error is harmless only if it is not prejudicial to the claimant or "inconsequential" to the ALJ's "ultimate nondisability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006); *see also Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). The determination as to whether an error is harmless requires a "case-specific application of judgment" by the reviewing court." *Molina*, 674 F.3d at 1118-19 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009), 28 U.S.C. § 2111)). In general, if the ALJ finds an impairment is not severe but accounts for each of a claimant's limitations in assessing the residual functional capacity, the step two error is harmless. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

For example, in *Lewis*, the Ninth Circuit determined that any error the ALJ committed at step two was harmless, where the ALJ failed to find the claimant's bursitis was a severe impairment yet considered the bursitis at step four. *Id.*, 498 F.3d at 911. The Court observed:

> The ALJ extensively discussed Lewis's bursitis at Step 4 of the analysis, observing that "[t]he claimant also had left-sided greater trochanteric bursitis." The decision also stated that x-rays showed osteoarthritic changes in Lewis's left knee; that Lewis's straight leg raise was "negative"; that Lewis had decreased sensation in his left leg; that Lewis was restricted from prolonged standing and walking; and that Lewis could not do repetitive squatting, kneeling, crouching, and crawling. The decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4.

*Id.*

In contrast, here, there is no evidence in the record to support the Commissioner's assertion that the ALJ accounted for Plaintiff's left shoulder impairment by finding "she can occasionally reach overhead." As Plaintiff observes, "[T]he most recent orthopedic surgeon's examination noted Plaintiff's range of motion was significantly restricted [and] raising her arm to even shoulder height caused pain." (Doc. 21 at 6) Because the ALJ did not discuss the evidence related to Plaintiff's shoulder impairment, the Court is unable to conclude that the limitation imposed at step four on overhead reaching, sufficiently addresses the medical condition described by the doctors.

Significantly, an ALJ "may not reject 'significant probative evidence' without explanation." *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995) (quoting *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984)). An ALJ may not selectively review the medical evidence and rely upon only favorable entries to support her decision. *Holohan v. Massanari*, 246 F.3d 1195, 1204-05 (9th Cir. 2001); *see also Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (the ALJ may not "pick and

choose … using portions of evidence favorable to his position while ignoring other evidence").

As set forth above, the ALJ failed to discuss—or even acknowledge—evidence of Plaintiff's shoulder impairment, including positive clinical signs and objective evidence not reviewed by any physician who offered functional assessments. The ALJ seemed to have performed a selective review of the evidence she not only omitted the clinical findings and MRI findings showing the complete rotator cuff tear, but also referred to the findings of Dr. Peterson related to Plaintiff's left hip while omitting his findings *from the same date* related to Plaintiff's left shoulder.  The ALJ also failed to address Dr. Peterson's recommendation for surgical repair of the rotator cuff tear.  (*See* Doc. 9-3 at 26; *see also* Doc. 9-15 at 64-68)

Because the ALJ failed to explain why she rejected significant and probative evidence related to Plaintiff's shoulder impairment in her decision and engaged in a selective review of the evidence, the ALJ erred in her analysis of the medical record.  This error was not inconsequential to the disability determination and cannot be deemed harmless.  *See Kendall v. Berryhill*, 2018 WL 2117380 at*13 (E.D. Cal. May 8, 2018) ("As the ALJ failed to discuss the significant, probative evidence favorable to Plaintiff contained in the medical opinions, the RFC was incomplete and the ALJ's error was not harmless"); *Croker v. Berryhill*, 2017 WL 1179148, at *4 (E.D. Cal. Mar. 30, 2017) (where the ALJ failed to consider significant medical records related to the claimant's impairments at step two, the step two determination was "not supported by substantial evidence" and the error was not harmless); *Martin v. Berryhill*, 2019 WL 3413475, at *4 (N.D. Cal. July 29, 2019) ("the ALJ's failure to discuss [probative] evidence in making the Step Two determination was reversible error," because when rejecting evidence "the ALJ must, at the very least, provide reasons for doing so").

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed when:

12

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Due to the ALJ's failure to discuss significant and probative evidence related to Plaintiff's physical impairments, a remand for further proceedings is necessary for proper evaluation of the record. *See Croker*, 2017 WL 1179148, at *4 (remanding the matter for further proceedings where the ALJ failed to consider significant and probative medical records at step two); *Martin*, 2019 WL 3413475, at *4 (same); *see also Pina v. Astrue,* 2012 WL 628522, at *5 (W.D. Wash. Jan. 30, 2012) ("because this matter should be remanded for proper consideration of all of the medical evidence, including all of the significant probative evidence, the Step Two determination regarding plaintiff's severe impairments should be considered anew following remand").

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in her evaluation of the medical record and failed to apply the correct legal standards. Consequently, the Court cannot uphold the ALJ's decision. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on this ground, it offers no findings on the remaining issue presented in Plaintiff's opening brief.

Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Cherie A. Palmer, and against Defendant, Andrew M. Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated: __August 22, 2019__      _____/s/ Jennifer L. Thurston__
                                                                UNITED STATES MAGISTRATE JUDGE